KING *vs.* HARMAN'S HEIRS.

EASTERN DIS,
*June* 1834.

KING
*vs.*
HARMAN'S
HEIRS.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT.

Bonds or obligations entered into in states where the common law prevails, the right of the parties thereto must be determined by that system of jurisprudence.

In cases where a fund has been created or assigned to indemnify the surety the original creditor may in equity cause himself to be paid out of this fund which is in the nature of a trust for his benefit.

A bond creditor in chancery has the benefit of all counter bonds or collateral securities given by the principal to the surety.

So where A gave his bond of indemnity to B to secure him against his guarrantee for C to D, on the failure of C, and B his surety becoming liable on his guarrantee to D, and assigning his indemnity bond from A, to the creditors of D: *held*, that the latter can recover on it even before actual payment by B.

This suit was instituted in January 1832, by James G. King residing in the city of New-York, and appointed by the court of chancery in that city, *receiver* in a suit in chancery on behalf of the creditors of E. H. Nicoll, an insolvent debtor, to enforce the payment of a certain bond of indemnity executed by G. W. Murray of New-York, and the late Thomas L. Harman of New-Orleans to one Henry Payson of Baltimore, in the penalty of thirty thousand dollars, as an indemnity of said Payson against two guarranty bonds which he had given to Edward H. Nicoll, Henry W. Nicoll, and Francis H. Nicoll of New-York. Thomas L. Harman being dead the suit was brought here against the late Joseph Thomas the curator and tutor of Thomas L. F. S. and Charlotte G. Harman, minors and the children of Thomas L. Harman, deceased. Col. Thomas died soon after the institution of the suit and it was prosecuted to judgment against N. Cox as the tutor to said minors. The facts of the case are as follow:

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

On the 5th April 1815, George W. Murrray executed to Francis H. Nicoll, Edward H. Nicoll and Henry W. Nicoll, a bond and mortgage to secure the payment of ten thousand dollars on the 1st January 1828, interest thereon to be paid annually.

The mortgage was of certain white lead works erected on leasehold ground: they were destroyed by fire in 1824 and the mortgage thus became of no value. On 31st January 1818, Henry Payson, of Baltimore, entered into articles of agreement with the Nicolls to guarantee to them the annual payment of the interest and the eventual payment of the principal of said debt. The said Murray did also, on 5th October 1815, give a receipt to Edward Tyler, who, it appears, was a United States officer of ordnance, for a quantity of lead, for the return or repayment of which, said Nicolls became guarantee; said Payson did also on 31st January 1818 execute an instrument of counter guarantee to and in favor of said Nicolls in relation thereto.

On the 13th January 1821 an agreement was entered into between Murray and Payson, that if Murray within six months from 30th November 1820 by good and sufficient security, would indemnify and release Payson from all liability, damages, &c., by reason of said two instruments of guaranty, then Payson would release and discharge Murray from certain liabilities in said agreement particularly mentioned.

On 30th July 1821 G. W. Murray and Thomas L. Harman, of New-Orleans, entered into a joint and several bond to Payson for thirty thousand dollars. This bond recites the said two acts of guaranty of Payson verbatim and refers to the agreement of 13th January 1821, and further recited that this bond is intended as a compliance with that agreement. The condition of the bond is, that Murray will indemnify, save and keep harmless Payson against his liability under and by virtue of said instrument of guaranty, and from and against all sums of money recovered, awarded, adjudged, decreed and paid under and by virtue thereof, and of and from all actions, suits, judgments and decrees that may in due course of law be brought, prosecuted, obtained and awar-

Eastern Dis.
*June,* 1834.

KING
*vs.*
HARMAN'S
HEIRS.

ded against Payson for and by reason of said instruments of guaranty, and against all payments, loss, damages, costs, charges and expenses; or in case of the default of Murray to indemnify, save and keep harmless Payson in manner and form aforesaid upon due and sufficient notice by Payson to Harman of the default of Murray, if Murray or Harman or either of them, shall and do well and truly indemnify save and keep harmless Payson of and from the liability, sums of money, actions, suits, judgments, decrees, payments, loss, costs, damages, charges, &c., then the obligation to be void, otherwise *to be and remain in full force and virtue.*

In May 1828, Francis H. Nicoll & Co. brought suit, in the Circuit Court of the United States for the southern district of New-York, against Payson, and judgment was rendered on the 20th November 1829 for thirteen thousand three hundred and ninety-nine dollars and fifty-eight cents, damages and costs on the mortgage guaranty.

In December 1829, F. H. Nicoll and E. H. Nicoll, survivors, &c., brought suit against Payson in the Superior Court of New-York, and in January 1830, judgment was rendered against Payson for one thousand four hundred and forty-one dollars and seventy cents damages and costs on the lead guaranty. We learn from this suit that F. H. Nicoll & Co. had been prosecuted by Tyler on their guaranty to him and judgment obtained against them. By the laws of New-York, which are in evidence, these judgments bear interest at the rate of seven per cent per annum after rendition till paid.

On the 26th July 1831, Payson by an act, reciting the judgments obtained against him by the Nicolls and that he was unable to satisfy the judgments otherwise than by assigning for the benefit of said E. H. Nicoll and F. H. Nicoll, or one of them, the counter bond from Harman: and also reciting that, by virtue of a bill in chancery filed by Elisha Tibbits, the said Tibbits might be deemed the representative of the creditors of E. H. Nicoll who had become insolvent, and assigned his property for the benefit of his creditors, assigns to Tibbits the said counter bond executed to him by Murray and Harman, that the same may be prosecuted and the proceeds

EASTERN DIS.
*June,* 1834.

KING
*vs.*
HARMAN'S
HEIRS.

applied to extinguish the judgments obtained against him.

On the 27th July 1831, Tibbits makes an assignment to James G. King, the receiver appointed by the court of chancery in the chancery suit referred to, in trust to prosecute the bond and apply the proceeds as the court shall direct. To a petition alledging these matters and claiming the penalty of the bond from the heirs of Harman, there is an answer of general denial. Besides the documentary evidence above referred to, there is proof of notice from Payson to Taylor at that time, viz.: the 1st May 1826, the tutor of the minor children of Harman of the suits brought against Payson and the refusal of Taylor to interfere. The evidence of G. W. Murray proves that when Harman became counter security to Payson, Murray made to him a conveyance of the white lead works in order to secure him.

Murray also proves notice to Taylor, that Harman's estate wold be called upon for the indemnity, and that suits had been brought against Payson. Murray stopped paying interest on the debt in 1824. Payson testifies that, to procure a counter indemnity against his own suretyship to the Nicolls, he released a claim of thirty-seven thousand dollars, which he had against Murray. That he had never called on Murray to comply with the requisitions of the indemnity bond of 30th July 1821, not supposing that he was authorised or required so to do. That Murray was a bankrupt in 1820, has been so ever since, and is so at this time. Payson never paid any thing to the Nicolls.

There is the further testimony of John Rathbone who was well acquainted with the parties and these transactions; that Harman in the spring or summer of 1821 transmitted to him from London a power of attorney to execute such a bond as is above described in favor of Payson, but that he refused to do it: that afterwards when Harman came to New-York from London he found fault with him for not executing the bond, and told him that he, Harman, had executed it. That in the winter preceding the July when said bond was executed, he, Rathbone saw Harman in Paris, who told him that Murray had applied to him, Harman, to assume upon himself the res-

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

ponsibility of Payson for Murray. That Rathbone cautioned and remonstrated with Harman against doing so, but Harman stated he was under obligations to Murray and wished to assist him, and mentioned the amount to which he was willing to go in his responsibility: he does not recollect the amount, but when he received the power of attorney to execute a bond to the extent of thirty thousand dollars, he concluded it was beyond the limits which Harman had mentioned to him in Paris, and, on that account declined executing the bond. In Paris, Harman stated to Rathbone, that he was willing to lose a certain sum which he named for the said Murray; that Harman knew the risk he ran in executing the bond. This witness also states that Murray and Payson are insolvent. Harman left Louisiana in the spring of 1820 and has not been here since.

The following passage in the will of Harman is also in evidence.

"After my decease to prevent litigation or disputes, I think it necessary to state, that having become the purchaser of the white lead manufactory in Broadway in this city, with the sole motive of serving my friend Mr. George W. Murray, I hereby will and bequeath to my said friend the whole free and undisputed possession of the said white lead manufactory and all its appurtenances to his sole use and benefit during his life, and at his death the same to revert to my children, or such of them as may be then living in equal proportions, provided however, nevertheless, that he the said George W. Murray shall continue to carry on the said manufactory of white lead without calling on my executors or administrators for any further advances than those already made by me, and that he shall also arrange and provide for the payment of a bond for the sum of ten thousand dollars due to Messrs. Nicolls in the year 1827 or '28 as the case may be, as also for one other claim for the sum of about five thousand dollars due for lead borrowed from the United States for which a suit is now pending."

It is admitted that the common law governs at the place

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

where the contract sued on was made and intended to be executed; and that the books of it are evidence of such law.

The defendants pleaded the general issue.

The plaintiff claimed the right to recover on two grounds: *first*, that where collateral security is given to a *surety* it results in favor of the person intended to be *secured:* that in this case the Nicolls' were the creditors intended to be secured and under the circumstances they have a right to pursue Harman: *second*, that Payson is entitled to an indemnity from Harman against the judgments rendered against him, and having assigned the bond with the right to prosecute for the benefit of the Nicolls', they are entitled to prosecute it for their own benefit.

The defendants insist that Payson could not prosecute this bond till he shows he has paid the debt; and if he be insolvent and unable and never does pay he cannot recover, nor the plaintiff as his assignee.

On the question of the right of the plaintiff to recover, the district judge observes that on examining the authorities cited, the court finds they are all cases where a fund or property was furnished by the original debtor to the surety, and the original creditor is in pursuit of this land or property on which he claims to have a lien. None of these cases go so far as to say, that, where there is a mere counter bond or personal obligation to the surety, the original creditor could bring suit against such counter obligor on his mere personal contract or covenant. To recognize such a rule in *extenso* would seem in contravention of the general principles that there is no equity against a surety and can be no action where there is no privity of contract. If this suit were brought to obtain the benefit of any fund or property given by Murray to Payson, or even to Harman, to secure them against the payment of the debt to Nicolls, it would come precisely within the authorities cited; and perhaps this case may fairly be brought within the reason of them by the evidence in the case. Murray proves that he made a conveyance of the white lead works to Harman as a counter security. Harman in his will states, that he bought those works to serve his

Eastern Dis.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

friend Murray; if he bought them he surely reserved a sufficiency of the price to pay a debt due on them, which he had himself guarantied. Murray was insolvent in 1820, and continued so ever since: the debt due the Nicoll's was secured by a mortgage on these works, and if he purchased them to secure himself against his indemnity, he will be considered as having received property from the principal debtor Murray as security, and his heirs are therefore bound to the Nicolls for the payment of that debt. This view of the matter would apply to both the debts due the Nicolls.

On the second point, viz: the right to recover as assignee of the indemnity bond of Harman, it is to be observed that the *casus contractus* has arrived. "Where the counter bond or covenant is given to save harmless from a penal bond, before the condition is broken, then if the penal sum be not paid at the day, and so the condition not preserved, the party to be saved harmless does by this become liable to the penalty and so is damnified, and the counter bond forfeited." *Salk.* 197, *p.* 3. In the present case there is a special damnification to Payson, viz: the judgments obtained against him. There can be no complete indemnity to Payson but in the payment of those judgments. It was an idle thing for Payson to give notice to Murray an insolvent; but Murray had full notice as his correspondence with Taylor proves. It is certain that Payson could recover on this bond, but if Payson was plaintiff and did recover, the court would not allow the money to go into his hands; it would see that money paid to the Nicolls the original creditors. Surely then there can be no reasonable objection why the Nicolls or their representative may not with the assent of Payson bring this suit for their own benefit and his protection. Payson obtained this indemnity at the sacrifice of a large debt due him by Murray. A decree in this case will be a complete indemnity to him; and he is entitled to it as against Harman and his heirs. There might seem a technical objection in this, that the assignment of Harman's bond appears to be received as a sort of satisfaction of the judgments against Payson; but the bond was forfeited when it was assigned, and defendants

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

are only to be released from the penalty by fulfilling the real conditions on which it was given. Upon a review of the whole circumstances of this case, it is believed that a court of equity in a common law state, would und..r either and certainly under both heads of recovery put forward by plaintiff, decree to him against the defendants under the indemnity bond of their ancestor, the amount of the judgments rendered against Payson.

Judgment was rendered against the tutor for fourteen thousand eight hundred and forty one dollars and twenty eight cents, with interest at the rate of seven per cent. per annum, &c. The tutor appealed.

*Slidell* and *Conrad* for the plaintiff.

1. Payson could himself maintain an action on the bond against the estate of Harman without payment of the debt. By the express terms of the agreement Harman undertook to *indemnify, save and keep harmless from all actions, judgements, suits and decrees,* that might at any time thereafter be in due course of law, brought against Payson, and from all loss which he might *sustain by means of any* judgement or decree, that might thereafter be awarded against Payson for or on account of his guarantee for Murray's debt. Judgements have been obtained against Payson on his guarantee for Murray's debt, and the condition of the bond can only be complied with and Payson kept harmless by the satisfaction of those judgments. *La. Code* 3026, *Pothier, Traité des obligations No.* 442. *Griffith* vs. *Harrison. Salkeld* 196, 7, *Reps. of Dickey* vs. *Rogers* 7 *N. S.* 588. *Flower* vs. *Jones* 7 *N. S.* 147.

2. The assignment of Payson vested all his right in the Nicolls and their representatives: but without it they could have availed themselves of Harman's guarantee. Under the common law, when collateral security is given for the better protection or payment of a debt, it will be made effectual for that purpose and that not only to the immediate party to the security, but to others who are entitled

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

to the debt. *Russel* vs. *Clarke's executors*, 7 *Cranch* 69. *Moses* vs. *Murgatroyd* 1 *Johnson's Chancery Rep.* 129. *Phelps* vs. *Thompson* 1 *Johnson's Chancery Reps.* 418. *Maner* vs. *Harrison* 1 *Equity cases Abridgd.* 93. *Exparte Rushworth* 10 *Vesey Chancery Reps.* 411. *Wright* vs. *Mosby* 11 *Vesey Chancery Reps.* 13. *Hume* vs. *Savings Bank* 7 *Connecticut Rep.* 478.

3. The Nicolls' or their representatives under our law could avail themselves of Harman's promise to indemnify Payson unless the contract was revoked with the consent of Payson before they declared their intention to profit by it. *La. Code art.* 1884. *Marigny* vs. *Remy* 3 *N. S.* 609 *and the authorities there quoted.* *Flower* vs. *Lane* 6 *N. S.* 151. *Andrus* vs. *Walker* 4 *La. Rep.* 238.

4. If Payson had instituted a suit, the judgment creditors could have intervened and claimed the advantage of it. They would have had a lien or privilege on any amount recovered, or if the money were received by Payson he would be compelled forthwith to pay it over to the judgment creditors. The law abhors circuity of action and if proper parties are before the court will cause that to be done directly, which must otherwise be done indirectly.

The right to have this action is given by the *Code of Practice, art.* 35. If Payson had been sued he could have called Harman's heirs in warranty and required them to pay the debt. *Lafonta* vs. *Poultz* 6. *N. S.* 393. *Thompson* vs. *Chaveau et al.* 6 *N. S.* 458.

*Strawbridge* for the defendant and appellant.

1. The assignees of Payson cannot prosecute this suit because it is for the recovery of a security debt of his which he has never paid.

2. The evidence shows that Payson is insolvent, is unable and never can pay the debt he guarantied; consequently Harman's heirs are not responsible, and cannot be until Payson pays.

3. That the indemnity of Harman is only given and to

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

become binding·in case Payson should have to pay and actually does pay the debt of Murray to the Nicolls.

4. The question whether a surety can be sued before he has paid is a matter of remedy or contract: if the former, it falls within the *lex fori*, and must be decided by the law of Louisiana, and suit can only be instituted after payment.  *La. Code* 3021.  8 *Johnson Rep.* 249.  10 *do.* 524. 1 *Washington, Pegon* vs. *French.*

BULLARD, J., delivered the opinion of the court.

The plaintiff sues to recover of the heirs of the late T. L. Harman, the amount of the penalty of a bond of indemnity executed by their ancestor jointly and severally with G. W. Murray of New York, in favor of Henry Payson.   Payson had been the surety of Murray on two bonds conditioned for the payment of certain sums of money to F. H. Nicoll, E. H. Nicoll, and H. W. Nicoll of New York, and the bond now in question was given to indemnify and save harmless the said Payson, against his responsibility on those bonds.   The Nicolls having recovered judgment against Payson for the amount of the original debt, the latter became insolvent, and in pursuance of certain chancery proceedings assigned the bond of indemnity to the present plaintiff for the use of the Nicolls, as a fund out of which the debt should be paid.

The answer of the defendants, which is in the nature of the general issue, brings the whole merits before the court on the evidence in the record.   Substantially thefore the case stands as if the Nicolls, the original creditors of Murray were seeking, under an assignment from Payson, after judgment recovered against him but unpaid, to recover the amount of their judgment in pursuance of the covenants in the bond of indemnity.

*Bonds or obligations entered into states where the common law prevails the rights of the parties there to must be determined by that system of jurisprudence.*

These different bonds were entered into in States of the Union, where it is admitted the common law prevails, and consequently the rights and liabilities of the parties are to be measured by that system of jurisprudence, and whatever

the plaintiff would be entitled to recover in a court of law or equity in the state where the transaction originated, he is entitled to in this court in the present form of action.

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

Our first inquiry is, what was the intention of the parties in giving and accepting this bond. Was it intended ultimately to operate in favor of the Nicolls for the better security of the debt due to them by Murray, or was it simply an obligation to refund to Payson whatever he should pay in consequence of his previous liability as Murray's surety? The whole instrument and all the concomitant circumstances must be looked at for this purpose. The bond recites that it had been previously covenanted and agreed between Murray and Payson, that if Murray would within six months from a certain day mentioned, by good and sufficient security, indemnify *or release and discharge* Payson from and against all liability, damage, costs, and charges, for or by means of certain instruments of guaranty, given to Nicolls and others, Payson would on his part release Murray from certain liabilities to him, Payson, the parties there say, "and whereas these presents are intended by the parties to said agreement, be as a compliance on the part of the said G. W. Murray, with so much of the said agreement as is above in substance and effect recited, now therefore, the condition of this obligation is such, that if the said G. W. Murray, &c. shall and do well and truly, indemnify and save and keep harmless, the said Henry Payson, &c. of from and against all his and their liability under and by virtue of the said two instruments of guaranty, and of and from and against all sum or sums of money that may at any time hereafter in due course of law be recovered, awarded, adjudged, decreed, and paid, &c. And of and from all actions, suits, judgments, and decrees that may at any time hereafter be in due course of law brought, prosecuted, obtained, and awarded against the said Henry Payson, &c.

It is in proof, that in order to procure this indemnity, Payson did release a debt due to him by Murray, amounting to upwards of thirty thousand dollars. And Murray who

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

was examined as a witness, swears that as counter security to Harman for the liability incurred by him in this bond to Payson, he conveyed to Harman certain property in New York, which had been mortgaged to Nicolls, to secure the original debt.

If we give effect and meaning to every clause and word in this bond; if we are to consider the varied form of expres_ sion and terms in which the parties express themselves as any thing but idle verbiage, we cannot but be convinced, that the parties meant something more than merely that Payson should be refunded what he might be compelled to pay to Nicolls on his guaranty. The parties say that Payson was to be released from his liability, and this bond was intended as a compliance with Murray's engagement to release and discharge him, and to save and keep him harmless. This intention could not be fully effectuated without the consent of the Nicolls, the original creditors, who do not appear to have been privy to this bond of indemnity. Is it a sufficient breach of any of the covenants of this bond that Murray and Harman suffered judgment to be recovered against Payson on the original debt against which they engaged to save and keep him harmless?

Perhaps according to our own law, this agreement fairly construed, might be regarded as in the nature of a *stipulation pour autrui*, which would authorise the original creditors, the Nicolls, to pass over Payson and by the *actio utilis* come directly on Harman for the amount of ihe debt when it fell due. Our inquiry is however confined to the question, whether a court of equity in the common law States, according to the principles laid down in works of acknowledged authority, would authorise them or those who represented them, to proceed on an assignment of the bond to recover the amount of their debt against the surety on the bond of indemnity?

The principle contended for and to a certain extent sanctioned by a train of decisions in courts of chancery is, that all securities given to the surety for his protection and indemnity against the debt inure to the benefit of the original

creditor, and that courts of equity will give them effect in his favor, that counter securitied follow the original debt, and are considered as substantially for the better protection of the original debt; the creditor being beneficially interested. ·In cases where a fund has been created or assigned to indemnity, the surety it seems will settle that the original credstor may in equity cause himself to be paid out of the fund, because it is in the nature of a trust for his benefit. To this extent there seems to be no difficulty. Equity would not permit the fund thus created, to be diverted to any other purpose; that is the payment of the original debt. But to what extent and in what case a bond of indemnity on collateral security given to the surety, would be regarded in equity as a fund created for the benefit of the creditor, between whom and the counter surety there existed no privity, is a question by no means free from difficulty. It would seem to us to depend on the condition of the bond of indemnity, and whether it had been forfited before the relief sought in equity. It then becomes a chose in action which perhaps may be reduced to possession for the benefit of the original creditor, according to the supposed intent of the parties. But this would depend on the question, whether as between the surety and the counter surety, the bond had been forfeited for a breach of the covenants; for it would seem to us against all equity, that the original creditors should interfere and make the condition of the counter surety more onerous, and render that engagement absolute in his favor which was only conditional as to the surety.

A cursory view of the adjudged cases within our reach may show us to what extent and under what limitations this doctrine has been carried by courts of equity.

In the case of *Manno* vs. *Harrison*, it was said that a bond creditor shall in chancery have the benefit of all the counter bonds or collateral securities given by the principal to the surety as if A owes B money, and C are bound for it, and A gives C a mortgage or bond to indemnify him, B shall have the benefit of it to recover his debt. 1 *Equity Ca. abr.* 93. In this case the nature or conditions of the bond are not

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

In cases where a fund has been created or assign- ed to iedemnify the surety the ori ginal creditor may in equity cause himself to be paid out of the funds which is in the nature of a trust for his bene- fit.

A bond creditor in chancery has the benefit of all counter bonds or collateral securi- ties given by the principal to the surety.

EASTERN DIS.
June, 1834,

KING
vs.
HARMAN'S
HEIRS.

shown.    It would seem that the principle was first announced in this case, and in terms sufficiently broad to cover almost any case.    But it does not appear to have been a case against a surety on a bond of indemnity.    If it was a mortgage, then it would amount to a trust fund.

In the case of *Russell* vs. *Clark's executors*, decided by the Supreme Court of the United States, the principal question was whether a certain letter of recommendation from one merchant to another in favor of the bearer, amounted to a guaranty against certain endorsements and other engagements undertaken in favor of the person who was recommended.    Murray & Co., the bearers of the letter, became insolvent and made assignments of their property.    Russell to whom the letter was addressed, endorsed their bills to a large amount, the proceeds of which were employed in the purchase of rice, which among other things was assigned, and Russell sued the trustee to discover funds of Murray & Co., and prays that the intention of the parties as to the guaranty, may be enforced and payment made on account of the endorsements out of the fund arising from the sales of the rice.

The facts of the case are complicated; and it is not necessary to mention them all.    But there was a fund in the hands of the trustees, and the question was, whether Russell who had endorsed the bills of the insolvent on the strength of the letter of recommendation, should be paid out of a particular fund.    Chief Justice Marshall in delivering the opinion of the court says, " it is settled in this court that the person for whose benefit a trust is created, who is to be the ultimate receiver of the money, may sustain a suit in equity to have it paid directly to himself.    This trust being to pay J. and W. Russell a sum they are liable to pay to N. Russell, and being created in such terms that the money is certainly payable to them, the purposes of equity will be best effected by decreeing it in a case like the present, to be paid directly to N. Russell.    Indeed a court ought not to decree a payment to J. and W. Russell, without security that the debt to N. Russell should be satisfied."    But nothing was finally

EASTERN DIS.
*June,* 1834.

KING
*vs.*
HARMAN'S
HEIRS.

decided; the cause was remanded with leave to make new parties. Here was a fund in money to be distributed by trustees, and the question was how it should be distributed. In the case now before the court, the difficulty lies deeper; the very existence of the trust is denied by the defendants. 7 *Cranch's Rep.* 69, 97.

In the next case cited, that of *Moses* vs. *Murgatroyd.* 1 *Johnson's Ch. Rep.* 119. Chancellor Kent said, after quoting the case of *Maure* vs. *Harrison* above referred to, " These collateral securities are in fact trusts created for the better protection of the debt, and it is the duty of this court to see that they fulfil the design." The securities here spoken of consisted in fact of a quantity of coffee assigned by the debtor to his endorser by way of indemnity against his liability, and the question was how much of the proceeds should be appropriated to pay the original creditor who was the plaintiff. In this case it further appears that the assignment of the coffee was absolute, and parole evidence was admitted to show the real intention of the parties, and the chancellor remarked that it was not material whether the plaintiffs were apprised at the time of the creation of this security.

*Phillips* vs. *Thompson.* 2 *Johnson's Ch. Rep.* 417, was precisely this: a judgment bond was assigned to indemnify certain endorsers. The same principle was applied to the disposition of the funds paid under the judgment. The holder of the note was considered entitled to the benefit of the collateral security.

The Supreme Court of Errors of Connecticut recognised the same doctrine in the case of *Homer* vs. the *Savings Bank,* and stated the principle as extracted from the different cases to be; that when the collateral security is given on property assigned for the better protection of the debt, it shall be made effectual for that purpose. 7 *Connecticut Rep.* 478.

The question in the case of *ex parte Rushworth,* 10 *Vesey,* 420, related to the right of the surety in a bond of indemnity, to avail himself of the proof made by the creditors under a commission of bankruptcy for his own reimburse-

EASTERN DIS.
June, 1834.

KING
vs.
HARMAN'S
HEIRS.

ment. It was in fact a question of subrogation, and Lord Eldon said that a surety is entitled to all the securities the principal has; the very converse of the proposition advanced in the other cases. In *Wright* vs. *Mosley*, 11 *Vesey*, 13, the master of the rolls stated the question to be whether the court would act upon the assignment at the instance of the surety in whose favor it was made. His argument rests upon what he considers a settled principle, that as the creditor is entitled to the benefit of all the securities, the principal debtor has given to his surety, so the surety has full as good an equity to the benefit of all the securities the principal gives to the creditor.

It will have been perceived that in all the cases, which have thus come under review the creditors who sought relief in equity proceeded upon a tangible fund created originally for the indemnity of the surety but which by a kind of equitable fiction was regarded as the real pledge of the creditor. In the present case that fund consists not in money, but in the liability of Harman under his bond. According to the principle stated by Chief Justice Marshall, if Payson were now demanding the money from the defendants, if it be really due, the Court of Equity would not decree it to him without requiring security that it should be paid over to the original creditors. This case differs from all the others and we are driven back at last to the question, has this bond been forfeited and had a right of action accrued to Payson before he assigned the bond to the plaintiff?

So where A gave his bond of indemnity to B to secure him aginst his guarantee for C to D, on the failure of C, and B his surety becoming liable on his guarantee to D and assigning his indemnity bond from A, to the creditors of D: *held*, that the latter can recover on it even before actual payment by B.

We have already said that the intention of the parties appears to have been, that Murray should release and discharge Payson from all liability on account of his guaranty. Harman acceded to this obligation as surety and stipulated that on notice of the default of Murray being given, he would step in and save Payson from loss. Notice is proved to have been given and we are of opinion that they did not comply with the covenants and the bond was forfeited.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be affirmed with costs.